IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SECSYS, LLC,
a New Mexico Limited Liability Company,

       Plaintiff,

vs.                                                                                    CIV No. 07-0664 DJS/RLP

ROBERT VIGIL, in his individual capacity, and
ANN MARIE GALLEGOS, in her individual capacity,

       Defendants.

## MEMORANDUM OPINION

**THIS MATTER** is before the Court on the following motions: (1) Defendants' Motion for Summary Judgment as to the Second Amended Complaint **[Doc. No. 74]**, filed on September 29, 2010; (2) Plaintiff's Motion for Partial Summary Judgment as to Liability on Count II of the Second Amended Complaint and Memorandum in Support Thereof **[Doc. No. 77]**, filed on October 15, 2010; and (3) Defendants' Motion and Memorandum for Leave to Allow Filing of a Sur-Reply **[Doc. No. 87]**, filed on November 29, 2010.  All motions are fully briefed.  Having reviewed the motions, the memoranda in support and in opposition, and the applicable law, the Court finds that Defendants' Motion for Summary Judgment as to the Second Amended Complaint is well taken and will be **GRANTED**.  Plaintiff's Motion for Partial Summary Judgment as to Liability on Count II of the Second Amended Complaint and Memorandum in Support Thereof is not well taken and will be **DENIED**, and Defendants' Motion for Leave to Allow Filing of a Sur-Reply is **DENIED** as moot.

## I.  Background

George Everage was an employee with the New Mexico State Treasurer's Office (NMSTO) when Robert Vigil was the New Mexico State Treasurer.  Ann Marie Gallegos was

the Assistant State Treasurer. While employed at the NMSTO, Everage proposed to Vigil a method of raising more income for the office through a securities lending program.

On April 18, 2005, the New Mexico State Treasurer's Office (NMSTO) issued a Request for Proposals (RFP) for a Securities Lending Oversight Manager (SLOM). The SLOM was to contract with the NMSTO for the purpose of overseeing the new securities lending program, whereby securities-lending agents would arrange for short-term loans of selected treasury funds to highly-rated borrowers. Second Am. Compl. ¶ 7. The NMSTO's investment policy authorized this program. The SLOM would provide interest income to the NMSTO. In return, the SLOM would be paid a fee calculated as a percentage of the value of the securities that the NMSTO lent. *Id.*

Everage left the NMSTO to bid for the contract to oversee this program as the SLOM. Everage created a business entity SECSYS, LLC (SECSYS) which, in response to the RFP, submitted a proposal to the NMSTO on May 2, 2005. *Id.* ¶8. SECSYS was the only bidder on this RFP. Defs.' Mot. Summ. J.; Ex. C. Before Everage left the NMSTO, Vigil told him he had a friend whose wife needed a job and asked him if Everage would hire her if he received the contract. Vigil told Everage he would have to pay her $500 to $1000 per month, and by hiring her Everage would be helping him out. In April of 2005, Everage learned the "friend's wife" Defendant Vigil wanted SECSYS to hire was Samantha Saiz, the wife of former New Mexico State Treasurer Michael Montoya. Everage alleges Defendants continued to pressure him to hire Saiz. Second Am. Compl. ¶ 10.

As part of its response to the RFP, SECSYS submitted an addendum proposing that Saiz be added as a potential subcontractor for SECSYS on the SLOM contract. Defs.' Mot. Summ.

J.; Ex. A.[1]  Saiz submitted her resume directly to the NMSTO via fax.  *Id.*; Ex. B.

The NMSTO Evaluation Committee recommended SECSYS be awarded the SLOM contract.  The committee noted Everage "has proposed using a third party who holds an MBA and who has information technology experience . . . that would compliment the skills of Mr. Everage."  Defs.' Mot. Summ. J.; Ex. C.

Everage continued to negotiate with Defendants regarding the SECSYS's proposal for the SLOM contract even as Defendants' demands to hire and adequately compensate Saiz remained pending and unresolved.  By the end of May 2005, Plaintiff and the NMSTO had agreed to numerous contract terms under the RFP, including a provision that the services of SECSYS would be compensated at thirty (30) percent of the securities lending portion of the fee split.  Second Am. Compl. ¶13.

On June 13, 2005, Everage wrote to Defendant Vigil and advised him that Saiz and SECSYS were at an impasse in their negotiations.  Defs.' Mot. Summ. J.; Ex. D.  Everage informed Defendant Vigil that SECSYS had offered Saiz $45,000.00 or 40% of the net income from the SLOM contract, but she wanted 40% of gross income.  Everage further informed Defendant Vigil that in numerous conversations with Defendant Gallegos regarding the issue, Defendant Gallegos had stated that SECSYS "must make Ms. Saiz an offer that she would accept."  Defs.' Mot. Summ. J.; Ex. D.  Everage also informed Defendant Vigil that his understanding from him and Defendant Gallegos was that "if I do not give Ms. Saiz whatever

---

[1] The addendum to the proposal was addressed to Defendant Gallegos.  The addendum stated SECSYS wanted to submit the name of Saiz as a potential subcontractor "provided the employment of a subcontractor is specifically approved by the Treasurer's Office."  Additionally, the addendum indicated Saiz's duties had not been delineated by the parties.  Saiz was to submit her resume directly to Defendant Gallegos.

compensation she wants, that a new RFP will be issued for the SLOM, despite the existence of the contract with SECSYS, LLC." *Id.*

On June 23, 2005, Defendant Gallegos responded to Everage's June 13, 2005 letter in an attempt to clarify "several items." *Id.*; Ex. E. In her letter, Defendant Gallegos made the following points: (1) there was no legally binding SLOM contract because the NMSTO had not signed it; (2) the skills Saiz would bring to the contract had been part of the NMSTO's evaluation of the SECSYS proposal and thus all the skills offered in the proposal were needed; and (3) if all issues outlined in the letter were not addressed to the NMSTO's satisfaction, the contract would not be finalized. *Id.*

Everage replied to Defendant Gallegos's letter on July 7, 2005. *Id.*; Ex. F. In his letter, Everage stated there was a legally binding contract between SECSYS and the NMSTO. Furthermore, Everage noted that SECSYS had all the skills necessary to perform the contract and that involvement in the project by Saiz was unnecessary.

On July 15, 2005, the NMSTO's attorney wrote Everage informing him of the NMSTO's position. *Id.*; Ex. G. First, the letter made clear that there was no contract. Nonetheless, the letter stressed that even assuming there was a contract, the NMSTO was "hereby terminat[ing] any alleged contract with you and your firm." *Id.* Termination of the contract was done pursuant to the "termination" language of the contract.

On August 2005, the NMSTO rebid the SLOM position. Defs.' Mot. Summ. J.; Ex. H. The August 2005 RFP provided that the SLOM contract could be broken into two components, one dealing with the securities lending oversight duties and the other with IT and reporting duties. *Id.*; Ex. K; Perkins Dep., p. 21, lines 2-15. Andrew Perkins, a certified public accountant, responded to the RFP on September 9, 2005. *Id.*; Ex. I. Saiz also responded to the

4

RFP.  *Id.*; Ex. J.  The NMSTO Evaluation Committee reviewed the proposals and recommended the NMSTO award the securities lending oversight duties to Perkins and award the IT and reporting duties to Saiz.  *Id.*; Ex. L.

In his deposition, Perkins testified that Defendants advised him the SLOM fee, which was 30% of the lending agents shares of the securities lending profits, would be split equally between him and Saiz.  Defs.' Mot. Summ. J.; Ex. K, Perkins Dep., p. 31, lines 12-25.  Perkins further testified Defendants made it clear that "if you want the contract you need to put Samantha Saiz in there."  *Id.*; Ex. K, Perkins Dep., p. 30, lines 20-22.  Defendants also told Perkins how much he was going to pay Saiz.  Perkins was to pay Saiz "half of the 30% split."  *Id.*; Ex. K, Perkins Dep., p. 31, lines 12-17.  Defendants informed Perkins that he was to pay Saiz through his CPA firm.  *Id.*; Ex. K, Perkins Dep., p. 33, lines 9-24.  Perkins testified he "made it clear in writing– and I wanted to do that for everybody in the world's benefit, because I didn't know where this was going, that I didn't ever want her in my contract.  Therefore, you don't ever see her in my proposal."  *Id.;* Ex. K, Perkins Dep., p. 34, lines 1- 12.  Perkins testified that he never formally or informally agree to split his fee with Saiz.  *Id.*; Ex. K, Perkins Dep., p. 60, lines 1-8.

## II.  Standard of Review

The Court will grant summary judgment when there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.  FED.R.CIV.P 56(c).  The movant carries the burden of establishing there are no genuine issues of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1609 (1970), but may discharge its burden by showing there is an absence of evidence to support the non-movant's case, *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986).  Once the movant meets its burden, the

burden shifts to the non-movant to demonstrate a genuine issue for trial on a material matter. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). In making its summary judgment determination, the court looks at the pleadings and documentary evidence in the light most favorable to the non-movant, *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir. 1991), and the movant must show beyond a reasonable doubt it is entitled to summary judgment, *Hicks v. City of Watonga, Okla.*, 942 F.2d 737, 743 (10th Cir. 1991). However, once the burden shifts to the non-movant, that party may not rest on its pleadings but must set forth specific facts showing there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. Nonetheless, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no *genuine* issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10 (1986). If the non-movant cannot make such a showing after adequate time for discovery, summary judgment is mandated. *Celotex Corp.*, 477 U.S. 322, 106 S.Ct. at 2552. The Court will consider Defendants' motion for summary judgment and Plaintiff's motion for partial summary judgment in light of these standards.

### III. Discussion

In its First Amended Complaint, Plaintiff brought a §1983 claim alleging a violation of its Fourteenth Amendment rights to due process.[2] Specifically, Plaintiff alleged it had a property

---

[2] On August 8, 2008, the Court entered a Memorandum Opinion and Order, granting Defendants' Motion to Dismiss Plaintiffs' Complaint. Doc. No. 32. The Court granted Defendants' motion "subject to Plaintiffs' leave to file a motion to amend the complaint with respect to Count I." Mem. Op. at 8. The Court further found the Complaint failed to state a claim on behalf of Plaintiff Everage and therefore dismissed him.

interest in the SLOM contract. First Am. Compl. ¶23. Plaintiffs alleged Defendants "unlawfully violated [its] rights under the Fourteenth Amendment . . . to be secure in this property by breaching the contract between the NMSTO and SECSYS" when "it refused to hire Samantha Saiz." *Id.* ¶¶24, 25.

In the Court's June 24, 2009 Memorandum Opinion and Order, the Court found Plaintiff did not have a valid contract with the NMSTO. Mem. Op. at 5. The Court further found "the contract between Plaintiff and [the NMSTO] did not give rise to a protectable property interest which can support its §1983 action." *Id.* Thus, Plaintiff's Fourteenth Amendment procedural due process claim failed. Nonetheless, the Court noted that Defendants did not address Plaintiff's allegations regarding Defendant's criminal actions in seeking payoffs for letting the contract. The Court stated these actions raised a substantive due process violation. Plaintiff then filed its Second Amended. After the close of discovery, Defendants filed their motion for summary judgment, requesting the Court reconsider this issue.

**A.  Substantive Due Process Claim**

The issue before the Court is whether Plaintiff's substantive due process rights were violated when "Defendants' actions . . . deprived [it] of its legal entitlement to receive compensation for the work it performed, to contract with employees of its own choosing, to make business decisions concerning employee hiring and compensation free from outside pressure, to decide with whom to work, to compete on an equal footing or 'level playing field' with other similarly situated bidders and contractors, and to have its bids or contracts evaluated on the basis of a rational relationship to legitimate state objectives and lawful contract terms." Second Am. Compl. ¶30.

Defendants argue that "both a procedural and a substantive due process claim require at a bare minimum that the plaintiff's constitutional rights are being violated." Defs.' Mot. Summ. J. at 9. Defendants contend that Plaintiff's substantive due process claim fails because it is based on the deprivation of a property right and since Defendant Vigil merely attempted to deprive it of an established property right there was no actual deprivation. Defendants base their argument on the fact that the jury only convicted Defendant Vigil of "attempted extortion." *See United States v. Vigil*, 523 F.3d 1258 (10th Cir. 2008).

However, Plaintiff alleges more than a deprivation of a property right. Plaintiff alleges that Defendants "unlawfully violated [its] right to due process under the Fourteenth Amendment by abusing their power and using it as an instrument of oppression, making decisions regarding the SLOM contract that do not bear a rational relationship to legitimate state objectives and lawful contract terms" and these decisions were "arbitrary, capricious, irrational, spiteful, malicious, and objectively unreasonable as to shock the conscience." Second Am. Compl. ¶28.

The Fourteenth Amendment specifies that no State shall "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Constitution amend. XIV, §1. "[T]he touchstone of due process is protection of the individual against arbitrary action of government . . . whether the fault lies in a denial of fundamental procedural fairness . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46, 118 S.Ct. 1708 (1998) (internal quotations and citations omitted).

The Supreme Court has described two strands of the substantive due process doctrine. One strand protects an individual's fundamental liberty interests, while the other protects against the exercise of governmental power that shocks the conscience. *See Chavez v. Martinez*, 538

U.S. 760, 787, 123 S.Ct. 1994, 2011 (2003) (Stevens, J., concurring in part and dissenting in part) ("The Due Process Clause of the Fourteenth Amendment protects individuals against state action that either 'shocks the conscience,' or interferes with [fundamental] rights 'implicit in the concept of ordered liberty' " (citations omitted)).

A fundamental right or liberty interest is one that is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Id.* at 775. Without these rights, "neither liberty nor justice would exist." *Palko v. Connecticut*, 302 U.S. 319, 326, 58 S.Ct. 149 (1937). Fundamental liberty interests are preciously guarded. "[T]he Fourteenth Amendment forbids the government to infringe fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 2302 (1997) (internal quotations and ellipsis omitted).

On the other hand, conduct that shocks the judicial conscience is deliberate government action that is "arbitrary" and "unrestrained by the established principles of private right and distributive justice." *Lewis*, 523 U.S. at 846 (quoting *Hurtado v. California*, 110 U.S. 516, 527, 4 S.Ct. 111 (1884)). This strand of substantive due process is concerned with preventing government officials from "abusing their power, or employing it as an instrument of oppression." *Id.* (internal marks omitted). Not all governmental conduct is covered, however, as "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* Plaintiff brings its substantive due process claim pursuant to the "shocks the conscience" strand.

"Substantive due process claims are not based on state law but are founded upon deeply rooted notions of fundamental personal interests derived from the Constitution." *Hennigh v. City*

9

*of Shawnee*, 155 F.3d 1249, 1256 (10th Cir.1998) (quotation and citation omitted).  Therefore, the Due Process Clause is not "a font of tort law to be superimposed upon whatever systems may already be administered by the States."  *Daniels v. Williams*, 474 U.S. 327, 332, 106 S.Ct. 662 (1986); *see also DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 202, 109 S.Ct. 998 (1989) (stating that "the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation").

The Supreme Court has repeatedly emphasized that in dealing with abusive executive action "only the most egregious official conduct can be said to be arbitrary in the constitutional sense."  *Lewis*, 523 U.S. at 846 (internal quotations omitted).  "Thus, in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847.  "[T]he standard for judging a substantive due process claim is whether the challenged government action would 'shock the conscience of federal judges.'"  *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir.1995) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126, 112 S.Ct. 1061 (1992)).  In order to satisfy this standard,

> [A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power. Instead, a plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking . . . . The level of conduct required to satisfy this additional requirement cannot precisely be defined, but must necessarily evolve over time from judgments as to the constitutionality of specific government conduct.

*Livsey v. Salt Lake County*, 275 F.3d 952, 957-58 (10th Cir. 2001) (quoting *Tonkovich v. Kan. Bd. of Regents,* 159 F.3d 504, 528 (10th Cir. 1998)(internal quotations and citations omitted).

Because only the "most egregious official conduct can be said to be arbitrary in the constitutional sense," *Lewis*, 523 U.S. at 846, the Supreme Court has been reluctant to expand

10

the doctrine of substantive due process. The Court must bear in mind three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety. *Ruiz v. McDonnell*, 299 F.3d 1173, 1184 (10th Cir. 2002).

Upon reconsideration of the allegations in Plaintiff's Second Amended Complaint in light of the relevant three factors, the Court concludes that it does not allege an actionable substantive due process violation. The second principle, the concern that § 1983 not replace state tort law, is relevant to Plaintiff's case. Its claim is similar to a state tort law cause of action– a state claim for tortious interference with contract against Defendants. *See Valdez v. New Mexico*, 109 Fed.Appx. 257, 262 (10th Cir. 2004). Defendants' actions interfered with Plaintiff's negotiations to execute its contract with the NMSTO by requiring it to hire Saiz and specifying what Plaintiff would pay her. Although Defendants "abused or misused" government power, their actions do not rise to "a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking . . . ." *Livsey,* 275 F.3d at 957-58. Accordingly, the Court will grant summary judgment as to this claim.

## B.  Equal Protection Claim

Plaintiff contends the Court should analyze its equal protection claim under "the well-established framework for adjudicating equal-protection claims in public employment and government contracting cases." Pl.'s Resp. at 14. On the other hand, Defendants argue that Plaintiff's case "is not an invidious discrimination case, does not involve suspect classifications like race or gender, and must be analyzed as a class-of-one case." Reply at 1. The Court agrees.

Citing to *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 113 S.Ct. 2297 (1993), Plaintiff claims it has "demonstrated that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Id.* at 666. In *Jacksonville*, an association of contractors challenged an ordinance that gave preferential treatment to certain **minority-owned businesses** in the award of city contracts. The Supreme Court held that the injury in fact constitutionally required for standing to challenge on equal protection ground a **racially discriminatory** procedure for distributing a scarce governmental benefit, such as public works contracts, is the "inability to compete on an equal footing" for the rationed benefit, not the deprivation of the benefit itself. *Id.* Plaintiff has not shown that he was deprived of the NMSTO contract because of a suspect classification and fails to point to the discriminatory policy that allegedly prevented it from competing on an equal basis.

Next, Plaintiff concedes that its case is different from employment cases in which a plaintiff alleges discrimination in employment based on being a member of a "protected class" such as race or gender. Resp. at 17. Nonetheless, Plaintiff "asks the Court to decide, as a matter of law, that there is no rational basis for the classification asserted in Paragraph 32 of Plaintiff's Second Amended Complaint, and that discriminating against Plaintiff on the basis of that classification would be just as unlawful under the Equal Protection Clause as discrimination based on an already recognized suspect classification such as race and gender." *Id.* Paragraph 32 describes a classification "between those bidders or contractors who agreed or acquiesced to paying a specific amount or percentage of proceeds from the contract to former State Treasurer Michael Montoya's spouse, Samantha Saiz, and those who would not agree or acquiesce to such a specific and unlawful arrangement for compensating Ms. Saiz." The Court declines to do so as

12

the Court can analyze Plaintiff's claim under an equal protection claim brought by a "class of one" as set forth in *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073 (2000).

As previously noted, Plaintiff does not allege it is part of an identifiable group. However, the Supreme Court has recognized equal protection claims brought by a "class of one, where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073 (2000)(quotation omitted). "To succeed on such an equal protection claim, Plaintiff must prove it was 'singled out for persecution due to some animosity,' meaning that Defendants' actions were a 'spiteful effort to 'get' [Plaintiff] for reasons wholly unrelated to any legitimate state activity.'" *Mimics, Inc. v. The Village of Angel Fire*, 394 F.3d 836, 849 (10th Cir. 2005) (quoting *Bartell v. Aurora Pub. Sch.*, 263 F.3d 1143, 1149 (10th Cir. 2001) (quotation omitted). Additionally, Plaintiff must prove that it was treated differently than those similarly situated. *Id.*

Plaintiff's equal protection claim fails under this standard as it failed to show that it was treated differently than Perkins. Perkins testified that he was offered the NMSTO contract conditioned on Saiz receiving a portion of the earnings from the SLOM. Defs.' Mot. Summ. J.; Ex. K; Perkins Dep., p. 30, lines 20-22. Perkins further testified that he did not want Saiz in his contract and did not formally or informally agree to split his fee with Saiz. *Id.*; Ex. K; Perkins Dep., p. 31, lines 12-25, p. 60, lines 1-8.

Additionally, in its Second Amended Complaint, Plaintiff claims the discrimination was a result of Defendants' personal animosity toward Plaintiff. Second Am. Compl. ¶¶34, 36. However, Everage testified at Defendant Vigil's first trial, stating, "I liked Robert Vigil. I still do. . . . He always treated me with the greatest respect and deference." Defs.' Mot. Summ. J.;

13

Ex. N. Because Plaintiff cannot show that it was treated differently than Perkins and that Defendants' actions were the result of ill will or animosity, its equal protection claim fails. Accordingly, the Court will grant summary judgment as to this claim.

Because the Court has granted Defendants summary judgment as to Count II of Plaintiff's Second Amended Complaint, the Court denies Plaintiff's Motion for Partial Summary Judgment as to Liability on Count II of the Second Amended Complaint. Additionally, the Court will deny as moot Defendants' Motion for Leave to Allow Filing of a Sur-Reply.

**NOW, THEREFORE,**

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment as to the Second Amended Complaint **[Doc. No. 75]** is **GRANTED**. This action is dismissed with prejudice.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment as to Liability on Count II of the Second Amended Complaint and Memorandum in Support Thereof **[Doc. No. 77]** is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Leave to Allow Filing of a Sur-Reply **[Doc. No. 87]** is **DENIED** as moot.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**